In the Matter of the Arbitration between PRIMA PRODUCTS, INC., Appellant, and AQUELLA PRODUCTS, INC., Respondent.

First Department, March 25, 1952.

*Jack Hart* of counsel (*Joseph A. Bergadano* with him on the brief; *Engelman and Hart,* attorneys), for appellant.

*Ira A. Campbell* of counsel (*Rufus Barringer* with him on the brief; *Kirlin, Campbell & Keating,* attorneys), for respondent.

BERGAN, J. By several assignments the respondent Aquella Products, Inc., and Usines De La Seigneurie, which as a matter of convenience will here be called the " French Corporation ", have succeeded to reciprocal contractual obligations undertaken in 1945 for the sale of paint.

Among other things Aquella agreed to pay the French Corporation royalties on sales made throughout an extensive territory. In 1949, Aquella assigned to appellant Prima Products, Inc. its rights under that contract within a portion, but not all, of the territory set forth in the 1945 agreement.

Prima agreed with Aquella, among other things, to pay the royalties due under the 1945 contract for paint sold within the territory it had acquired, and to hold Aquella " harmless for any claim or demand " arising from Aquella's 1945 contract.

In case of any controversy " under this agreement between the parties hereto " which they are " unable to adjust between themselves " either party could resort to arbitration. Aquella and the French Corporation by the 1945 agreement were also committed to the arbitration of " any controversy under this agreement between the parties hereto."

In June, 1951, the French Corporation instituted against Aquella an arbitration proceeding which sought an accounting for paint sold within the territory covered in the 1945 contract between Aquella and Prima. Other matters in controversy between the French Corporation and Aquella, with which Prima could have no concern were swept within the petition for arbitration.

As a respondent in the arbitration proceeding instituted by the French Corporation, Aquella filed a petition addressed to the

Administrator of the American Arbitration Association. On the title to the proceeding, Aquella added to the enumerated parties Prima, as a " Third Party Respondent ".

Its petition to the Administrator recited the institution of the proceeding for arbitration by the French Corporation; alleged the assignment to Prima of some of the rights under the contract with the French Corporation; averred that an " unsettled controversy exists " with Prima " and therefore impleads " Prima " herein as a third respondent ". Its requested relief was that Prima be directed to answer " this petition " and to proceed with the arbitration.

Prima, thereupon, instituted a judicial proceeding in the Supreme Court to stay the arbitration on the ground that no controversy exists and that there is no authority in law or by the terms of its agreement to arbitrate, or under the rules of the American Arbitration Association to join it as a third party.

The court at Special Term was of opinion that there was an arbitrable controversy between these parties and expressed the view that procedurally arbitration ought to follow the " enlightened " practice which courts have adopted in respect of bringing in third parties.

We deal first with the arbitrable nature of the controversy. Arbitration, so the parties had contracted, was to be resorted to for a " controversy under this agreement," and " between the parties hereto ". Aquella's petition to the Administrator shows no dispute with Prima " under " its agreement. It shows merely that under another agreement with another party covering in some part the subject matter with which it also agreed with Prima, it has been called upon to arbitrate in pursuance of an arbitration clause to which Prima is a stranger.

It has been a consistent judicial policy in supervising arbitration facilities first of all to examine the question whether an actual controversy exists. A good example is *Matter of Webster* v. *Van Allen* (217 App. Div. 219). The parties there had an agreement to arbitrate any dispute over the purchase and sale of property. Notes were given arising out of the transactions and were not paid. There was no dispute over the notes or the nonpayment and court was of the opinion that the obligation under the notes was not a " controversy " within the intention of the parties. The availability of the " remedy " i.e., arbitration, rests upon whether there is a " genuine controversy ". (Davis, J., p. 221.)

No present controversy between Aquella and Prima is shown about anything, nor are any facts stated in the petition of

Aquella to the Administrator or in the proof before the Special Term which would suggest an existing controversy, except of course, on the procedural point whether Prima can or cannot be required to become a party in the French Corporation's arbitration proceeding.

All this does not amount to a controversy under the contract within its express language in respect of arbitration. The language can be read in no other way, we think, than in the usual sense of meaning a disagreement between the parties about the way one or the other has effected the assumed conditions of the contract. That somebody else charges one of the parties with a collateral liability arising from the same subject matter is not usually regarded as a controversy " between " the parties.

Prima agreed by its contract to hold Aquella harmless from any claim or demand by the French Corporation arising from Prima's performance of its contract. But this right would not mature to the point of becoming an arbitrable controversy between the parties until, gathered in from the whole area of controversy between Aquella and the French Corporation, it had been ascertainable what part was attributable to Prima's contract. When it was ascertained what the claim against Aquella was, this in turn would become arbitrable between Aquella and Prima only after it was shown, as the contract required, that it was a " controversy * * * which they are unable to adjust between themselves ".

Besides this, the procedure in arbitration under this agreement does not provide the facilities for widened adjudication afforded by the New York civil practice. The third-party practice in the court is not based on an expansive concept of what is a controversy. It is based, rather, upon the judicial economy implied when one controversy can be envisaged before maturity from the existence of another one.

This becomes manifest from the language describing the party who may be brought in by a defendant as one " who is or may be liable to him for all or part of the plaintiff's claim against him ". (Civ. Prac. Act, § 193-a.) This is not necessarily, or even often, an existing controversy between defendant and the third party; it is a provision, merely, for a potential controversy.

No doubt contracting parties could make enforcible agreements for the arbitration of potential related disputes on the perimeter of controversy, but it is clear from the language of the agreement before us and from the Commercial Arbitration Rules of the American Arbitration Society both that the parties here have not done so and that no intent to have done so is implicit from existing and accepted arbitration procedure.

The judicial process has been able to reach out to get ultimate adjudication of all liabilities possible and implied from existing litigation because the court is able to exert the compulsion of public power and the Legislature, and the judges themselves, have felt it wise and economical to exercise it in this direction.

A compulsion is exerted on the absent party to come in, as indeed it is exerted on the defendant in the first place, and this sort of compulsion is a hallmark of judicial power. But compulsion is the antithesis of arbitration. People are often in court without any consent at all and, indeed, against their strongest wishes in the premises. But if they are in an arbitration proceeding they are there solely upon their free initial submission. That judicial compulsion is sometimes needed to carry out what the parties freely agreed in the first place to do, does not change the freedom of jurisdictional choice in its inception.

We do not regard it as an admissible construction of the arbitration clause between Aquella and Prima, that Prima thereby consented to become a party to another arbitration proceeding in which it may have an interest but concerning which no present controversy with Aquella is shown.

That it might be useful and perhaps convenient to do this in arbitration adds nothing to the argument in a case where the words of a contract become the measure of the court's authority.

The order denying petitioner's application for a stay of the arbitration proceedings should be reversed, with $20 costs and disbursements to the appellant, and the motion granted, with $10 costs.

SHIENTAG, J. (dissenting). The respondent, Aquella Products, Inc. (hereinafter called " Aquella "), and Usines De La Seigneurie (hereinafter called the " French Corporation "), were assignees of rights and obligations under a contract involving the sale of a waterproofing paint made according to a special formula. Aquella was granted the exclusive right to manufacture and sell this paint, under the trade name " Aquella ", in various countries, and for its part agreed to pay royalties of 5% of the sales price. In December, 1949, Aquella sold to the petitioner, appellant Prima Products, Inc. (hereinafter Prima), its rights under this contract in a portion of the territory reserved to it, in consideration of which Prima agreed, *inter alia,* to assume the obligation to pay royalties and to hold Aquella harmless for any claim or demand arising out of the sale of the paint. Both contracts contained clauses providing for arbitration by the American Arbitration Association of disputes arising thereunder.

The French Corporation has initiated an arbitration proceeding before the American Arbitration Association against Aquella and several other parties. One of the principal items of relief there sought against Aquella is an accounting for royalties allegedly due the French Corporation upon sales of the waterproofing paint. It appears that in the territory assigned to Prima that corporation has been selling a waterproofing paint, under the name of Aquella, on which it has refused to pay royalties to the French Corporation, contending that the paint it is selling differs in composition from that embraced in the above contracts. Aquella has filed a petition with the American Arbitration Association, requesting an arbitration of the respective liabilities of Prima and itself with respect to the paint sold by Prima, which arbitration it wishes to have proceed as part of the first arbitration with the French Corporation. It was to stay this latter arbitration that Prima commenced the present proceeding. The court at Special Term denied this stay.

The learned majority of this court holds that Special Term erred in refusing this stay. It so holds substantially on the ground that no actual or present controversy has been shown to exist as between Aquella and Prima and in any event that the two arbitration proceedings should be separate and distinct. I believe such a controversy does exist. If, in its petition for arbitration, Aquella alleged that it had information that Prima Products, in violation of its contractual promise was refusing to pay to the French Corporation royalties on the sale of paint, and was basing this refusal on the spurious claim that it was selling a different kind of paint, it would not be doubted that Aquella had disclosed a genuine controversy between itself and Prima requiring arbitration under their contract. Aquella would be entitled to demand arbitration to establish whether or not Prima was in fact violating its agreement with Aquella to pay the appropriate royalties to the French Corporation and to hold Aquella harmless from any complaints made by the French Corporation. Realistically considered, Aquella's allegations that if it be found liable to the French Corporation, Prima is, in turn, liable to it, states substantially the same thing. Thus, Aquella has set forth an actual and present controversy with Prima, which is entirely harmonious with the definition of controversy set forth by the majority — "a disagreement between the parties about the way one or the other has effected the assumed conditions of the contract."

However, I see no reason why the word " controversy " should be given a narrow, rigid construction. If the contracts in question contained no arbitration clause and the French Corporation had commenced a court action against Aquella, there is no doubt but that Aquella would be entitled to implead Prima upon the allegations here set forth. It would certainly be an anomalous development if arbitration proceedings are rendered more rigid and inflexible than actions at law. The Court of Appeals has said that " Proceedings of this kind are equitable in character ", and that " To work well it [arbitration] must operate with a minimum of delay and with all the flexibility which equity can give it." (*Matter of Feuer Transp., Inc.*, 295 N. Y. 87, 92, 91.) In the absence of clear indications of a contrary intention, I can see no valid reason why allegations which would be deemed sufficient to state a cause of action at law are not to be considered as involving a " controversy " for purposes of arbitration.

Prima urges that to require it to arbitrate controversies with Aquella in the context of Aquella's arbitration with the French Corporation would impose upon it a responsibility greater than that which it assumed in its contract. I see no merit to this contention. There is nothing in the contract, nor in the rules of the American Arbitration Association, which prohibits or excludes the simultaneous arbitration of controversies which present the identical factual question. Whether or not the two arbitrations should proceed separately or together, seems to me a question which should be governed by considerations of justice and convenience. In the arbitration between the French Corporation and Aquella, a central question will be whether the paint sold by Prima was embraced in the contract set forth above. That precise question will be decisive in the arbitration between Aquella and Prima. Particularly in view of the circumstances of this case, I can perceive no justification for requiring that very same question to be litigated twice before separate forums. To require the arbitrations to proceed separately would present the possibility of conflicting determinations of the same question with the result that Aquella might be found liable to the French Corporation without any recourse against the party which promised to hold it harmless. Such a result would be manifestly unjust; it has been found to be unsatisfactory in actions at law; there is no reason why it should be permitted to exist in the more informal arbitration proceedings. Whether the procedure sanctioned by the Special

Term be treated as in the nature of an impleader involving two pending arbitration proceedings, or a consolidation of the two proceedings, is largely a matter of procedure which it is the province of the American Arbitration Association to regulate.

To use the language of the Court of Appeals in *Matter of Feuer Transp., Inc.* (*supra,* p. 92), " If the relief to which a party is entitled is not granted and he is remitted to a new proceeding, the purposes of the reforms intended by the arbitration Law of 1920 would be defeated. Instead of relief from legal technicality, the parties to an arbitration are given delay and a surfeit of legal procedure. Proceedings of this kind are equitable in character, and the practice of equity as to relief should be followed. In equity proper relief is ordinarily granted when the facts warrant regardless of what may have been asked for ". The order appealed from should be affirmed.

DORE and COHN, JJ., concur with BERGAN, J.; SHIENTAG, J., dissents and votes to affirm, in opinion in which PECK, P. J., concurs.

Order reversed, with $20 costs and disbursements to appellant and the motion granted, with $10 costs. [See 279 App. Div. 1052.]